RECEIVED
APR 23 2026
KELLY L. STEPHENS, Clerk

**No. 26-3149**

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE SIXTH CIRCUIT

**JOHN KLOSTERMAN;**

**et. al.,**

**Plaintiff-Appellant,**

**v.**

**CITY OF CINCINNATI; KONZA, LLC; RICHARD BOYDSTON;**

**DENTONS BINGHAM GREENEBAUM LLP;**

**HAMILTON COUNTY LAND REUTILIZATION CORPORATION; et al.,**

**Defendants-Appellees.**

**On Appeal from the United States District Court for the Southern District of Ohio**

**Case No. 1:25-cv-00312-SJD-KLL | The Honorable Susan J. Dlott, District Judge**

## APPELLANT'S OPENING BRIEF

John Klosterman
Pro Se Appellant
5615 Sidney Road
Cincinnati, Ohio 45238
Telephone: (513) 250-2610
Email: johncklosterman@gmail.com

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES**............................................................4

**INTRODUCTION**............................................................6

**JURISDICTIONAL STATEMENT**............................................................9

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**...............................11

**STATEMENT OF THE CASE**............................................................14

**A. The RICO Enterprise: Fines to Foreclosure — The VBML as Legal Extortion**

**B. The Receivership (2020–2023)**

**C. The VL Designation: Predicted April 2023, Sworn July 2023, Confirmed Feb 2026**

**D. The Bench Trial Admission**

**E. Federal Criminal Convictions**

**F. The False Arrest and Wrongful Imprisonment**

**G. Procedural History**

**SUMMARY OF ARGUMENT**............................................................31

**I. Standard of Review**

**II. District Court Erred in Dismissing Admitted Allegations**

**III. Rooker-Feldman Was Misapplied**

**IV. Barton Was Misapplied**

**V. RICO Pattern Is Adequately Pleaded**

**VI. Claims Are Timely**

**VII. Leave to Amend Should Have Been Granted**

**VIII. RICO Liability: Higgins, Czanik, Fisher, Dinsmore; CAA;**

**Boydston Associate-in-Fact; BOR Attorney**

**IX. Lentine, Strunk, and Zurface: False Arrest as Enterprise Predicate Act**

**X. Emergency Relief Pending Appeal**

**CONCLUSION AND RELIEF REQUESTED..............................................51**

**Damages (Compensatory, Treble, Punitive, and Tax Gross-Up)....................................52**

**Constructive Trust and Specific Performance..............................................54**

**Reassignment Under United States v. Robin..............................................56**

**Request for Oral Argument and Reservation of Reply......................................56**

**CERTIFICATE OF COMPLIANCE......................................................57**

**CERTIFICATE OF SERVICE.........................................................58**

**ADDENDUM (District Court Orders)......................................................59**

**DESIGNATION OF RELEVANT EXHIBITS..............................................60**

## TABLE OF AUTHORITIES

**CASES**

**Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143 (1987) …. Pg. 12, 38**

**Ashcroft v. Iqbal, 556 U.S. 662 (2009) …. Pg 33**

**Barton v. Barbour, 104 U.S. 126 (1881)....Pg 35**

**Boyle v. United States, 556 U.S. 938 (2009)..... Pg. 43**

**Brady v. Maryland, 373 U.S. 83 (1963)....Pg. 13, 45**

**Commissioner v. Glenshaw Glass Co., 348 U.S. 426 (1955)..... Pg. 54**

**Erickson v. Pardus, 551 U.S. 89 (2007).... Pg. 39**

**Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005).... Pg. 34**

**Fischer v. United States, 603 U.S. 480 (2024) …. Pg. 37, 40**

**Foman v. Davis, 371 U.S. 178 (1962).... Pg. 39**

**H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)..,.. Pg. 38**

**Hilton v. Braunskill, 481 U.S. 770 (1987)....Pg. 46**

**In re McKenzie, 716 F.3d 404 (6th Cir. 2013)....Pg. 31,35**

**Lance v. Dennis, 546 U.S. 459 (2006)....Pg. 34**

**McCormick v. Braverman, 451 F.3d 382 (6th Cir. 2006)....Pg. 31,34.**

**Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog,**

945 F.2d 150 (6th Cir. 1991)....Pg. 46

Moon v. Harrison Piping Supply, 465 F.3d 719 (6th Cir. 2006)....Pg. 38

Nakoff v. Fairview General Hospital, 75 Ohio St.3d 254 (1996).... Pg. 54

Ne. Ohio Coal. for the Homeless v. Blackwell, 467 F.3d 999 (6th Cir. 2006)....Pg. 47

Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981)....Pg. 55

RevoLaze LLC v. Dentons US LLP, 8th Dist. Cuyahoga No. 109742,

2022-Ohio-1392....Pg. 41

RLR Invs., LLC v. City of Pigeon Forge, 4 F.4th 380 (6th Cir. 2021)....Pg. 34

Smith v. Wade, 461 U.S. 30 (1983)....Pg. 55

United States v. Robin, 553 F.2d 8 (2d Cir. 1977)....Pg. 55

United States v. Turner, 465 F.3d 667 (6th Cir. 2006).... Pg. 36,40

U.S. ex rel. Williams v. Renal Care Grp., Inc., 696 F.3d 518 (6th Cir. 2012)....Pg. 51,55

Vemco, Inc. v. Camardella, 23 F.3d 129 (6th Cir. 1994)....Pg. 38

FEDERAL STATUTES

18 U.S.C. § 1341 (Mail Fraud)....Pg 23,36,43

18 U.S.C. § 1343 (Wire Fraud).....Pg. 36,40,43

18 U.S.C. § 1344 (Bank Fraud).... Pg. 28,36

**18 U.S.C. § 1512(b)(3) (Witness Tampering)....Pg. 37**

**18 U.S.C. § 1512(c)(2) (Obstruction of Official Proceeding)....Pg. 23,37,40,44**

**18 U.S.C. § 1951 (Hobbs Act / Extortion)....Pg. 15,36,47**

**18 U.S.C. § 1956 (Money Laundering)....Pg. 36**

**18 U.S.C. §§ 1961–1968 (RICO)....Pg. 10**

**18 U.S.C. § 1964(c) (Civil RICO Remedies)....Pg. 54**

**26 U.S.C. § 104(a)(2) (Physical Injury Exclusion)....Pg. 29,45,54**

**28 U.S.C. § 1291 (Appellate Jurisdiction)....Pg. 10**

**28 U.S.C. § 1331 (Federal Question Jurisdiction).... Pg. 10**

**28 U.S.C. § 1651 (All Writs Act)....Pg. 46,48,50**

**28 U.S.C. § 2106 (Appellate Modification)....Pg. 51,55**

**42 U.S.C. § 1983 (Civil Rights — Compensatory and Punitive Damages)....Pg. 10,45,54,55**

**42 U.S.C. § 1985 (Civil Rights Conspiracy)....Pg. 13**

**OHIO STATUTES**

**O.R.C. § 2323.51 (Frivolous Conduct Attorney Fees)....Pg. 55**

**O.R.C. § 2735.04 (Receiver Duties and Administrative Expenses).....Pg. 20,24,37,38,43,47**

**O.R.C. § 4735.01 (Real Estate Broker Licensing).... Pg. 18**

**O.R.C. § 5709.12(F) (Land Bank Tax Exemption)....Pg. 23,52**

**Cincinnati Municipal Code §§ 1101-55 et seq. (VBML)....Pg. 14**

**RULES**

**Fed. R. App. P. 4(a)(2)....Pg.10**

**Fed. R. App. P. 8 (Stay Pending Appeal)....Pg.46,47**

**Fed. R. App. P. 27 (Emergency Motions).... Pg. 46**

**Fed. R. App. P. 31(a)(1) (Reply Briefs)....Pg. 56**

**Fed. R. App. P. 32(a)(7)(B) (Type-Volume Limitation)....Pg. 57**

**Fed. R. App. P. 34 (Oral Argument).... Pg. 56**

**Fed. R. Civ. P. 12(b)(6).... Pg.**

**Fed. R. Civ. P. 15(a)(2)....Pg. 39**

**Fed. R. Civ. P. 53 (Special Master).... Pg. 51**

**Fed. R. Civ. P. 65 (Injunctions)....Pg. 46,48**

**Ohio Rule of Professional Conduct 1.7 (Concurrent Conflicts)....Pg. 41**

**Ohio Rule of Professional Conduct 1.10 (Imputed Conflicts)....Pg. 41**

**Ohio Rule of Professional Conduct 3.3(a)(2) (Candor Toward Tribunal)....Pg. 12,25,40**

**Ohio Rule of Professional Conduct 3.7 (Lawyer as Witness)....Pg. 41**

**Ohio Rule of Professional Conduct 4.2 (Communication with Represented Person)....Pg. 42**

## INTRODUCTION

Six years ago, Appellant John Klosterman — a 76-year-old historic preservationist and federal whistleblower who spent 35 years rehabilitating Cincinnati's Sedamsville neighborhood — began asking a simple question: Where was the money going? The answer cost him everything. His $3.5 million property portfolio was seized for $800,000. He was imprisoned for a year on charges that a U-Haul receipt and two fuel receipts prove were physically impossible. His wife of 40 years died while he was in that prison. His properties — including buildings on the National Register of Historic Places — were stripped from him through a receivership that the receiver himself has now admitted under oath was engineered, and that Appellant's designation as a Vex. Litigator was a "fix" engineered by co-conspirator HCLRC.

What the enterprise did not account for was this: Appellant did not stop asking the questions.

Where did all the money go? Where are the bank records?

The federal government prosecuted and convicted Lentine — 63 months — and Strunk entered a guilty plea. The receiver's own testimony under oath at a January 2025 bench trial confirmed the core RICO allegation. His own motion papers established that any excess sale proceeds were to be returned to the buyer — HCLRC — rather than to Appellant, the property owner. The judge who entered the vexatious litigator order recused herself in March 2026, citing "appearance of impropriety," and found the procedure "procedurally unworkable." Every document the enterprise thought was buried has surfaced.

Two matters of urgency also require this Court's immediate attention. First, approximately $86,000 in escrow funds held by Provident Title in Case No. A1905588 are subject to competing disbursement demands. Boydston and HCLRC are engaged in settlement negotiations to close the receivership — negotiations that, on the record, would result in

payment of Boydston's disputed second billing invoice from the remaining estate funds without a court-supervised accounting. A stay of those escrow funds is required to preserve the subject matter of this appeal pending reconciliation. Second, Appellant's personal residence at 5615 Sidney Road is subject to over $60,000 in liens, fines, fees and taxes — the majority fabricated by the same enterprise that seized his portfolio — and the Vexatious Litigator order, fraudulently obtained, has stripped him of the ability to defend that property in state court. The enterprise is using its own fraudulent instrument to foreclose on the home of a 76-year-old man while his appeal is pending. This brief presents the merits and requests emergency relief.

## JURISDICTIONAL STATEMENT

**The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Appellant's claims arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968, and the Civil Rights Act, 42 U.S.C. §§ 1983 and 1985. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court entered final judgment on February 25, 2026. (R. 117; Addendum A-1.) Appellant filed his Notice of Appeal on January 8, 2026, which is treated as filed on the date the final judgment was entered. Fed. R. App. P. 4(a)(2). The December 10, 2025 dismissal order (R. 89; Addendum A-2) is incorporated into the final judgment. Standing: The complaint was filed as "Klosterman, et al." The "et al." designates the following co-plaintiffs, each a separate limited liability company wholly owned by Appellant and each holding properties that were separately subjected to the enterprise's VBML and receivership mechanisms: Emily Vets, LLC; Virginia Williamsburg, LLC; Boldface Properties, LLC; Sedamsville Heritage Properties, LLC; and John Jennagans, LLC. Each LLC is a separate legal person and a separate RICO victim whose assets were independently stripped through the enterprise's coordinated acquisition campaign. No standing deficiency exists.**

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

**1. Whether a district court may dismiss a RICO complaint as implausible under *Iqbal/Twombly* when the principal defendant admitted the core factual allegation under oath at a bench trial, and when his own motion papers confirmed that excess sale proceeds were contractually routed back to the buyer rather than to the property owner.**

**2. Whether the Rooker-Feldman doctrine bars federal claims alleging that defendants committed federal crimes and constitutional violations during state court proceedings, where the federal injury is independent of the state court judgment.**

**3. Whether the Barton doctrine protects a court-appointed receiver from claims alleging fraud, self-dealing, and ultra vires conduct — where the receiver drafted his own appointment order with self-enrichment provisions, retained a property manager despite billing-record documentation of that manager's prior federal felony conviction and pending criminal charges, and contractually directed surplus proceeds to the buyer rather than to the estate's owner.**

**4. Whether a six-year scheme involving multiple victims, seven federal predicate act categories including bank fraud and money laundering, $423,000 in unaccounted funds, and five federal criminal convictions satisfies RICO's pattern-of-racketeering-activity requirement.**

**5. Whether RICO claims are timely under the discovery rule and the four-year limitations period of *Agency Holding Corp. v. Malley-Duff*, when the defendant's sworn admission of the core allegation occurred in January 2025 and his post-dismissal "fix" statement occurred in February 2026 — both within the limitations period — and where active concealment through information-control directives and bank record obstruction independently tolls the period.**

**6. Whether the district court abused its discretion in denying leave to amend when its own page-limit order made adequate pleading of a six-year, 664-docket-entry, 5,451-page fraud structurally impossible, and when the futility finding rested entirely on the erroneous legal conclusions addressed in Issues 2 through 4.**

**7. Whether the record independently establishes RICO predicate acts for Amy L. Higgins, Kara A. Czanik, Cynthia Fisher, and Dinsmore & Shohl LLP as proposed defendants on remand — including Czanik's post-dismissal filing of a Notice of Supplemental Authority that cited the Luebbers strike order while omitting the recusal entered simultaneously, in violation of Ohio RPC 3.3(a)(2).**

**8. Whether the Hamilton County Board of Revision attorney committed independent RICO predicate acts of mail/wire fraud and obstruction of an official proceeding when he overruled the BOR's own appraiser to approve a $1,000 total valuation for 685 Halsey — where land alone was appraised at $17,000–$19,000 minimum — and a post-improvement reduction from $137,000 to $50,000 at 636 Delhi, neither result explicable by any legitimate valuation**

**standard, and the deliberate omission of the BOR attorney's identity from Boydston's otherwise meticulous billing records evidencing pre-arrangement.**

**9. Whether Lentine and Strunk, dismissed without prejudice under Rule 4(m), should be reinstated on remand where documentary evidence establishes the physical impossibility of the stalking allegations they fabricated seventeen days after Lentine's federal arrest; and whether Prosecutor Susan Zurface's coaching of false time-specific testimony — times the documentary record disproves — states independent claims under 42 U.S.C. § 1983 and *Brady v. Maryland.***

## STATEMENT OF THE CASE

### A. The RICO Enterprise: Fines to Foreclosure — The VBML as Legal Extortion

This appeal arises from a well-oiled municipal property acquisition machine that has seized over 1,500 properties in Hamilton County, Ohio over fifteen years. The enterprise operates through a coordinated "fines to foreclosure" scheme. But before any fine is assessed, before any lien is placed, before any foreclosure is filed, the enterprise needs a trigger — a legal mechanism that transforms a productive property owner into a trapped debtor. That trigger is the City of Cincinnati's Vacant Building Maintenance License ("VBML") requirement under Cincinnati Municipal Code §§ 1101-55 et seq.

The VBML is the money knife of this enterprise. Once the City designates a property as "vacant" — a classification the Building Department controls unilaterally — the owner is required to obtain a VBML at a cost of $3,000+ per year. The $3,000+ annual fee eventually becomes a lien on the property's title if it is not paid. But the VBML is structurally impossible for its targets to satisfy: it requires the owner to carry a specific category of commercial liability insurance on a vacant residential property that is either commercially unavailable at any price or available only at premiums that render the property economically worthless. The City designed the requirement knowing it cannot be met.

The constitutional infirmity is the double standard. HCLRC — the governmental entity that acquires the properties through this pipeline — is statutorily exempt from the VBML requirement as a governmental body. It does not pay $3,000 per year. It does not carry the impossible insurance. It imposes on private property owners a burden it has specifically exempted itself from bearing. Boydston, as court-appointed receiver, likewise could not obtain

**the required insurance at commercially reasonable rates — but was shielded by his self-drafted immunity provisions. The enterprise produced three uninsured fires in under three years causing $300,000+ in damages. Appellant had no fires in 35 years of property ownership.**

**The result across 1,500+ cases is a mathematically guaranteed acquisition machine. The $3,000 annual fee accrues. The insurance violation generates additional fines. Doubled administrative penalties pile on. Liens cloud title. The owner cannot sell, cannot refinance, cannot cure. The City forecloses. HCLRC acquires the property for the amount of the fines it was assigned as judgment creditor. The buyer owns the debt. The debt was manufactured by the buyer's partner. This is not code enforcement. It is Hobbs Act extortion under color of official right, 18 U.S.C. § 1951, operating at industrial scale.**

**Retaliatory Extortion. Months after Appellant filed his federal RICO complaint, the City issued its first-ever $15,015 invoice against Appellant — a retaliatory act using the same VBML mechanism. No such invoice had been issued in 35 years of Appellant's ownership. The timing is not coincidental; it is the enterprise's extortion reflex. In Appellant's case alone, VBML fees and related fines account for 60% of $200,000 in documented actual damages. The same mechanism is now deployed against Appellant's personal residence: over $60,000 in fabricated fines and fees support the foreclosure of 5615 Sidney Road while this appeal is pending.**

**The five-step scheme operates as follows: (1) The Cincinnati Building Department targets properties with code enforcement actions; fines and fees are assessed, then doubled through administrative penalties constituting extortion under 18 U.S.C. § 1951. (Ex. C.) (2) The inflated fines are placed as liens, clouding title and preventing sale or refinancing. (3) The City**

initiates foreclosure and assigns the judgment to HCLRC. (4) HCLRC becomes both buyer and debt owner — a structural conflict guaranteeing below-market prices. (5) HCLRC files to have the victim declared a vexatious litigator to foreclose the challenge.

As Boydston admitted in his February 25, 2026 filing, the VL designation was a "fix" engineered by HCLRC: "That kind of a fix is not available to the Receiver." (Ex. B.) The VL order was drafted by HCLRC trial counsel Amy L. Higgins of Dinsmore & Shohl and rubber-stamped by Judge Luebbers on October 27, 2023 — the order bears on its face: "Prepared by: /s/ Amy L. Higgins, Trial Attorney for Plaintiff." (Ex. F.) On March 19, 2026, Judge Luebbers found the procedure "procedurally unworkable" and recused herself citing "appearance of impropriety." (Ex. G1, G2.) The enterprise now deploys the same fraudulent VL order to prevent Appellant from filing any defense of his personal residence in state court foreclosure proceedings.

The City and HCLRC: Two Agencies, One Enterprise. On July 25, 2023, HCLRC board member Denning reported on "the City legal actions against Mr. Klosterman, categorizing him a vexatious litigator." (Ex. D.) But HCLRC — not the City — filed the VL lawsuit. Denning's attribution of the VL strategy to "the City" reveals that the City funded and directed the VL campaign while HCLRC executed it. Kelly Allesee was assistant city solicitor before transitioning to HCLRC General Counsel. Appellant's 59 Sedamsville properties were fed through this machine. His personal residence is its next target.

## B. The Receivership (2020–2023)

This case arises from the longest residential receivership in Hamilton County history — six years, 664 docket entries, 5,451 pages. Typical receiverships for code violations last weeks to

**months. The duration itself evidences that this receivership was never about code enforcement.**

**The 59 Sedamsville properties were not held in a single name. They were distributed across five separate limited liability companies: Emily Vets, LLC; Virginia Williamsburg, LLC; Boldface Properties, LLC; Sedamsville Heritage Properties, LLC; and John Jennagans, LLC — each holding a distinct portfolio of Sedamsville historic properties that Appellant had spent 35 years rehabilitating. The enterprise was not targeting a landlord. It was targeting a neighborhood, property by property, entity by entity, in a coordinated acquisition campaign tbat proceeded precisely as the Walt Disney Company acquired Central Florida in the 1960s: systematically, through separate transactions against separate legal entities, until the entire portfolio was assembled under common institutional control. The difference is that Disney paid fair market value. HCLRC paid $800,000 for $3.5 million in properties, using fabricated fines as the acquisition mechanism and a court-appointed receiver as the instrument. Each LLC is a separate legal person, a separate RICO victim, and a separate enterprise target whose assets were independently stripped through the same coordinated five-step scheme. The district court's "single victim" characterization collapses on contact with this structure: there are five separate legal persons, five separate portfolios, and five separate sets of property rights extinguished by the enterprise's machine.**

**On February 14, 2020, the Hamilton County Court of Common Pleas entered an Order Appointing Receiver in City of Cincinnati v. Klosterman, Case No. A1905588. (Ex. C.) The order appointed "Konza, LLC by its Manager Richard Boydston" as receiver over 59 Sedamsville properties. The Order bears Dentons document number 19709639.1 — Boydston drafted it himself. From the outset, Boydston simultaneously held three roles: (1) Manager of**

Konza LLC ($300.00 rate); (2) Counsel for Konza LLC (Dentons $350.00 rate); and (3) Author of tbe order defining his own powers, liability, and priority. The self-drafted order contained: a $1,000 bond for a $3.5 million estate (¶3); good faith immunity (¶4); owner lockout from properties (¶15); first-lien fee priority before the City's judgment (¶¶16, 18); sole authority to sell witb no appraisal requirement (¶17); complete immunity for Boydston and Dentons (¶13); and a provision requiring the owner to indemnify the receiver (¶4). The sales order document, drafted by Boydston and Kelly Allesee, directed that any excess sale proceeds be returned to the buyer — HCLRC — rather than to Appellant. In a legitimate receivership, surplus flows to the owner. Here it flowed by contract to the buyer.

Konza LLC was formed for a single purpose: to serve as receiver in this one case. Boydston's own testimony confirmed that Konza had only been used in this receivership, yet its formation documents authorized it to "engage in any business regarding purchase, sale, development, management of operation of real property" — without any provision that it operate as a receiver with fiduciary duties. A vehicle created to buy and sell property, now purporting to manage property as a court fiduciary, is the vehicle of fraud — not a credentialed fiduciary.

Pre-Appointment Billing. Boydston charged the receivership over $10,000 before he was formally appointed on February 14, 2020. His billing records document entries for "prepare for and attend receiver appointment hearing" on February 13, 2020 — the day before the court signed the order.

The Double-Billing Scheme. Boydston extracted through two vehicles: Konza LLC (100% Boydston-owned) billed $248,244 at rates up to $300/hour while unlicensed under O.R.C. § 4735.01 — all proceeds to Boydston; Dentons billed $158,429, of which approximately 60%

**was for non-receivership work. Konza LLC and Boydston billed not for different work but for 98% the exact same items — double recovery on the same hours.**

**Known Criminal History, Delegated Anyway. Boydston's billing records document that on March 6, 2020 — twenty days after appointment — he "researched Tri-State Organization Inc. and Joseph Lentine." That research would have disclosed: (1) Tri-State Organization Inc. was a Connecticut corporation not in good standing; (2) Lentine had a pending felony charge for passing bad checks; and (3) Lentine had served a prior 10-year federal incarceration. Despite this documented knowledge, Boydston delegated supervision of 59 properties and all financial management to Lentine without enhanced controls, without requiring licensure under O.R.C. § 4735.01, and without disclosing this background to the court.**

**TSO and the Criminal Enterprise. Boydston retained Tri-State Organization ("TSO") to manage the 59 properties. TSO was owned by Joseph Lentine, with Angel Strunk as bookkeeper. Over 34 months, Boydston admitted "near-daily contact" with Lentine. (Ex. L, ¶21.) The monthly reports tell the story: $423,000 collected, $437,000 paid out to TSO/Lentine, none to the receiver, and a $145,000 deficit — and no bank statements, no balance sheets, no payroll records. Appellant had paid for and set up QuickBooks for job costing and payroll in March 2020, approved by Boydston. It was never used.**

**The May 2020 Cover-Up Instruction. In month two of the receivership, Boydston issued a written directive channeling all TSO concerns exclusively through himself — not through the court. This directive is the enterprise's information-control mechanism, documented in writing before the first fraud report was filed. It explains why Appellant's filings were characterized as "vague": Boydston had ensured that corroborating financial records and direct court access were blocked at the source.**

**The FBI Investigations.** Appellant reported the PPP fraud, and the FBI visited Appellant at home twice — once in July 2020 and again in September 2020 — and questioned him about Lentine's financial crimes including money laundering through the receivership properties. Appellant was sworn to secrecy during the investigation. Because of this federal secrecy order, Appellant could not disclose to the state court why he knew a criminal enterprise was operating. State courts dismissed his filings as "beyond vague." When Appellant filed his May 2021 motion predicting federal criminal exposure and demanding bank records — which Boydston opposed as "beyond vague" — the FBI arrested Lentine exactly 81 days later, on August 31, 2021. Boydston knew before the arrest: the FBI interviewed him in late July or early August 2021. Despite this knowledge and his mandatory disclosure obligations under O.R.C. § 2735.04, he continued employing Lentine and Strunk and failed to report the federal investigation to the state court. In the weeks just before Lentine's arrest, the billing records show Boydston doubling up entries through Konza over Dentons — billing for meetings with Lentine at hourly rates over six consecutive days. These are entries for meetings that most likely never occurred.

**The City Knew Too.** FBI notification protocols in governmental investigations reached City Solicitor Andrew Garth. Garth informed Assistant City Solicitor Jacki Martin — who appears in Boydston's billing records 12 times. Martin resigned from the City Solicitor's office in the period coinciding with the federal investigation. After Lentine's arrest, Garth filed that "Lentine had ouly been arrested." That minimization was designed to keep Lentine in place. It worked. Garth is now an executive at HCLRC.

**The Pre-Negotiated HCLRC Transfer.** The sale was not a market transaction: City funding was secured in September 2022; HCLRC's board authorized acquisition in October 2022 —

before the January 2023 auction; Knoppe's competing $1 million bid was eliminated on a manufactured technicality; a January 24, 2023 meeting with HCLRC General Counsel Allesee identified $168,000 in undocumented expenses — yet the sale closed three weeks later, despite $423,169 unaccounted for. (Ex. E.) Boydston's billing records document 49 specific communications between himself and HCLRC's attorney Kelley Allesee coordinating this pre-arranged transfer.

**Boydston's Written Admission That He Delivered the Estate to HCLRC.** On January 12, 2026, Boydston filed his Reply to HCLRC's Opposition to his Second Fee Application — and in that filing admitted, in writing, that he personally "obtained the order approving the sale of all of the receivership property to HCLRC" and "saw to the closing on the HCLRC Sale," and that "obtaining that order and closing on the HCLRC Sale were, of course, of direct benefit to HCLRC." (Ex. AA.) A court-appointed receiver owes fiduciary duty to the estate he manages — not to the buyer; a receiver who writes in a filed court document that his work was "of direct benefit" to the buyer bas confessed to the inverted fiduciary structure that is the core of the RICO enterprise alleged here. The same filing documents the enterprise's collapse into internal dispute: Boydston complaining that HCLRC went silent for twenty-seven months after he delivered the estate and then refused to pay his agreed fees — the textbook pattern of thieves falling out once the proceeds are counted.

**Boydston Repeatedly Promised to Pay a Federally Convicted Racketeer From the Sale Proceeds.** In April 2025, TSO and Lentine — through counsel James L. Nieberding of Nieberding & Nieberding Co. LPA — filed Objections to the Magistrate's Decision in the same state-court proceeding from which Appellant was excluded. That filing establishes on its face that "Konza repeatedly promised to pay TSO from the proceeds of the final sale as a

form of consideration." (Ex. BB, TSO/Lentine Objections at 3, 8.) Boydston — a court-appointed fiduciary — repeatedly promising to pay a federally convicted bank fraud defendant from the proceeds of selling Appellant's properties is not an arms-length property management arrangement; it is the written admission of an enterprise payment structure. The presiding magistrate found on the record that "Konza desperately needed a property manager, and TSO provided that necessary service. It was not possible for Konza to manage these properties without TSO." (Ex. BB, Magistrate's Decision at 5.) A court-appointed receiver whose operation is "not possible" without a federally convicted racketeer is not administering a legitimate receivership; he is administering a vehicle whose operational dependency on the thief is the enterprise itself. The same exhibit contains Nieberding's December 19, 2025 motion to distribute $57,271.18 from the Provideut Title escrow to Tri-State Organization — a company owned by a defendant federally convicted of stealing $423,169 from the very same estate — and HCLRC's September 26, 2025 Opposition filed by Dinsmore & Shohl attorneys Kara Czanik and Brian Schultz, which concedes the precise escrow balance of $85,950.62 and negotiates the distribution schedule for the fruits of the fraudulent acquisition.

Nieberding's Enterprise Role. James L. Nieberding filed pleadings in April 2025 and December 2025 seeking to extract funds from Appellant's receivership estate on behalf of a federally convicted bank fraud defendant, for services rendered during the same thirty-five months the federal government proved Lentine was misappropriating receivership funds. A licensed Ohio attorney who files a civil claim seeking payment for his client's conduct during the exact period of that client's federal conviction has used legal process to extract proceeds of the underlying fraud — conduct that constitutes an independent predicate act of wire fraud

(18 U.S.C. § 1343) and obstruction of an official proceeding (18 U.S.C. § 1512(c)(2)) on remand. Nieberding is a proposed additional defendant.

The February 25, 2026 Memorandum: Boydston's Most Damaging Admissions Yet. On the same day as the federal district court's final judgment (R. 117), Boydston filed in state court a Corrected Memorandum in Opposition to HCLRC's Motion to Terminate Receivership. (Ex. CC.) That filing contains three admissions that, individually and together, collapse any remaining fiction that the receivership or the sale was arms-length. First, Boydston admits in writing that "the Receiver was a necessary agent for delivery of the properties to HCLRC." (Ex. CC at 10.) A court-appointed fiduciary does not deliver an estate to a buyer; he administers the estate for the benefit of all parties in interest. Boydston's written admission that he functioned as the agent of delivery to a pre-selected institutional purchaser is an admission of the fiduciary inversion at the heart of this RICO action. Second, Boydston catalogs the hidden subsidy architecture of the acquisition: the $800,000 cash component "could have been a combination of federal COVID era federal funding, State of Ohio funding, Hamilton County funding, and City funding" — all undisclosed (Ex. CC at 10) — and HCLRC additionally obtained more than $400,000 in real estate tax exemptions under R.C. 5709.12(F) (Ex. CC at 3, 10). What HCLRC actually paid, in economic terms, for a $3.5 million portfolio was not $800,000; it was a fraction of that once hidden government subsidies are accounted for. Third, Boydston discloses that the Port of Greater Cincinnati Development Authority — which holds the management agreement with HCLRC and serves as its institutional parent — earned net income of $16,330,694 in 2024 alone. (Ex. CC at 3.) Collectibility of any judgment against HCLRC and the Port is not in question.

**The City and HCLRC: The Same Bed.** The February 25, 2026 Memorandum exposes, in Boydston's own characterization, the institutional sleeping arrangement this brief has alleged from the outset. Boydston admits that HCLRC "negotiated the assignment from the City of Cincinnati of the judgment lien against John Klosterman" for consideration that "has not been disclosed," while HCLRC further negotiated undisclosed funding of the cash component of the purchase price with the City. (Ex. CC at 4.) The buyer purchased the assigned debt from the City for an undisclosed sum, while the City simultaneously funded part of the purchase price through undisclosed channels. That is not two adverse parties; that is one institutional operation with two names on its letterhead, exactly as HCLRC board member Denning acknowledged when he attributed the VL strategy to "the City legal actions." (Ex. D.) Boydston's February 25 filing confirms what Denning said two and a half years earlier: the City and HCLRC have operated as a single coordinated enterprise, moving property from private ownership into institutional control at twenty cents on the dollar, using fabricated fines as the acquisition currency and hidden governmental subsidies as the financing mechanism.

**Boydston's Fiduciary Violations — The Open Ledger of Breach.** A court-appointed receiver under O.R.C. § 2735.04 owes fiduciary duties that are not aspirational. They are statutory. He must account for all receivership funds; he must disclose all material facts to the court; he must administer the estate for the benefit of all parties in interest; he must avoid self-dealing; he must operate at arms-length from purchasers and adverse claimants; and he must report, not conceal, wrongdoing by those he has retained. Boydston's own filings — the January 12, 2026 Reply, the February 25, 2026 Memorandum, and the billing records of six years — establish, in his own words, that he violated every one of these duties. He drafted his own appointment order with self-enrichment provisions (Ex. C). He billed through an unlicensed

entity while also billing through Dentons for the same hours (Ex. R). He retained a federally convicted racketeer whose prior felony and pending charges were documented in his own research entries (Ex. R, March 6, 2020). He repeatedly promised to pay that racketeer from the proceeds of the sale (Ex. BB). He obstructed bank record production for six years. He concealed from the state court the FBI investigation he personally knew about. He contractually routed surplus proceeds back to the buyer rather than the owner. And now he has confessed in writing that he was "a necessary agent for delivery of the properties to HCLRC" (Ex. CC) while complaining that his institutional partner has refused to pay him. The breach is not alleged. It is documented, in his own filings, in his own words, across three years of court submissions.

Excess Proceeds Back to the Buyer. Boydston's own motion papers stated explicitly that in the event there was cash left over after payment of receivership fees and expenses, the title company acting as escrow agent was to pay the remaining balance back to the land bank — HCLRC, the buyer. Approximately $84,278. in such funds is presently held by Provident Title as escrow agent pending resolution of competing demands. These funds are the subject of an emergency stay request set forth in Argument Section X.

C. The VL Designation: Predicted April 2023, Sworn July 2023, Confirmed February 2026

Step 1 — April 3, 2023: Appellant filed a letter with Judge Luebbers and Magistrate Berding expressly warning that the VL action was retaliatory — filed "without merit" in response to his preparation of a civil RICO action to be titled "The Receivership Scheme," predicting predicate acts of wire fraud, collusion, obstruction of justice, money laundering, conspiracy, and racketeering, and cross-referencing U.S. Government Case No. 1:21mj633 (the FBI

investigation that produced the Lentine and Strunk convictions). The letter also reported HCLRC General Counsel Kelly Allesee's on-the-record statement to Magistrate Berding that the issues before the court "are the tip of the iceberg" — an acknowledgment by the buyer's General Counsel, before closing, that the documented receivership problems were a fraction of the actual wrongdoing. HCLRC closed the acquisition anyway. (Ex. U.) Every prediction in Appellant's April 3, 2023 letter came true. The warning sat in the case record when the VL Order was entered seven months later.

Step 2 — July 14, 2023: Appellant filed a sworn, notarized affidavit stating that the bank record denials "further proves that Dentons agent Mr. Boydston allegedly was in on the fix and that he himself was involved in racketeering with Denton full knowledge." Three months before the VL Order was signed, Appellant used the precise word — "fix" — that Boydston himself would use in February 2026. (Ex. V, ¶33.)

Step 3 — October 27, 2023: HCLRC trial counsel Amy L. Higgins of Dinsmore & Shohl drafted the VL Judgment Entry. The order bears on its face: "Prepared by: /s/ Amy L. Higgins, Trial Attorney for Plaintiff." (Ex. F.) The enterprise's own attorney drafted the judicial order silencing the enterprise's primary witness — at the precise moment Appellant would have moved to enjoin the January 2023 sale.

Step 4 — February 25, 2026: Boydston filed a document in Case No. A1905588 admitting the VL designation was a "fix" engineered by HCLRC: "That kind of a fix is not available to the Receiver." (Ex. B.)

**Step 5 — March 19, 2026: Judge Luebbers issued two rulings the same day: a strike order finding the VL procedure "procedurally unworkable," and a recusal entry citing "appearance of impropriety." (Ex. G1, G2.)**

**Step 6 — March 20, 2026: Czanik/HCLRC filed a Notice of Supplemental Authority citing Judge Luebbers' strike order while omitting the recusal entered the same day. (Ex. I.) Ohio RPC 3.3(a)(2) prohibits a lawyer from failing to disclose directly adverse legal authority. A judge's same-day recusal for "appearance of impropriety" in the proceeding being cited as authority is directly adverse to the argument that the proceeding was legitimate. This is an independent predicate act of obstruction occurring after the district court dismissal and squarely before this Court.**

**The Continuing Harm. The fraudulently obtained VL order — found defective by the judge who signed it — remains on the books in state court and is being wielded to prevent Appellant from filing any defense of his personal residence in foreclosure proceedings. The enterprise's most effective silencing instrument is being deployed against a 76-year-old man's home while his federal appeal is pending. This is not a collateral consequence. It is the enterprise's operation in real time.**

**<u>D. The Bench Trial Admission</u>**

**This is the apex fact of this appeal. At a bench trial in January 2025 in Case No. A1905588, Defendant Richard Boydston testified under oath:**

> **Q: <u>"Was this purchase price the value of the properties, or was this calculated to satisfy the expenses of the receivership?"</u>**

A: "It was hoped that that would cover the expenses of the receivership with agreed reductions…that was my belief at the time."

(Ex. A, Bench Trial Transcript at 156:8-15.)

Boydston further admitted that the "negotiation…was in anticipation of a haircut for Konza, and a haircut for TSO." Joseph Lentine testified at the same bench trial that the transfer to HCLRC was "an engineered sale" and that HCLRC received preferential access to occupied properties that no other bidder received — confirming the competitive bidding process was a sham. A district court cannot dismiss as implausible under *Iqbal/Twombly* a complaint that two defendants have admitted under oath.

E. Federal Criminal Convictions

Joseph Lentine: 63 months federal imprisonment for bank fraud under 18 U.S.C. § 1344, including approximately $1.2 million in fraudulent PPP loans and $423,169 in misappropriated receivership funds. (Ex. J.) Angel Strunk: federal guilty plea; 5 years' probation, drug testing, restitution of $47,000 at $500/month. (Ex. K.) Three additional federal convictions from the same conduct. The pattern Appellant documented is not speculative. It has been proven beyond a reasonable doubt in federal court.

F. The False Arrest and Wrongful Imprisonment

Seventeen days after Lentine's August 31, 2021 federal arrest, Angel Strunk filed a false police report accusing Appellant of stalking her on September 17, 2021 at approximately 8:15 a.m. Documentary evidence forecloses any innocent explanation: a U-Haul rental receipt documents Appellant in Cincinnati at 8:00 a.m.; a fuel receipt places him in Delhi, Ohio at 8:28

a.m. — thirteen minutes after the alleged stalking; and a second fuel receipt places him in Hebron, Ohio at 10:46 a.m. en route to Pittsburgh. (Ex. S.) No person can simultaneously stalk someone in Cincinnati and purchase fuel in Delhi, Ohio thirteen minutes later.

Appellant was wrongfully imprisoned for approximately one year on these fabricated charges. That imprisonment coincided precisely with the period in which the enterprise completed its pre-negotiated transfer of Appellant's 59 properties — silencing the one person positioned to challenge the sale in court. Appellant's wife of 40 years died while he was imprisoned on the fabricated cbarges. Prosecutor Susan Zurface coached Strunk to provide specific times for the alleged stalking incidents without factual foundation. The false arrest was not incidental to the enterprise. It was its most effective operational tool.

Physical Injuries During Wrongful Imprisonment. The consequences of the wrongful imprisonment extended beyond loss of liberty. While incarcerated on Strunk's fabricated charges, the 71 year old Appellant was severely beaten by another inmate. The severity of the assault required emergency transport to the University of Cincinnati Medical Center, where Appellant was evaluated for potential internal injuries and underwent MRI examination for head trauma. Appellant spent over two months in the jail medical ward recovering from those injuries. The perpetrator received an additional six months on his sentence as a direct consequence of the attack. (Ex. Z.)

These documented physical injuries — sustained as a foreseeable consequence of imprisonment on fabricated charges in a county jail — are recoverable as damages proximately caused by the enterprise's wrongful conduct. Under 26 U.S.C. § 104(a)(2), damages attributable to physical injuries and physical sickness are excluded from gross income; the UC Medical Center hospitalization, internal injury evaluation, MRI, and

**two-month medical ward stay establish that the wrongful imprisonment damages include a substantial physical injury component that qualifies for that exclusion. The physical injury component strengthens the § 1983 claims against Zurface, Strunk, and Lentine AND Boydston: a prosecutor who coaches false testimony resulting in wrongful imprisonment is liable not only for the loss of liberty but for the foreseeable physical consequences of that imprisonment.**

**G. Procedural History**

**On May 13, 2025, Appellant filed a 104-page complaint. (R. 1.) On June 26, 2025, Magistrate Judge Litkovitz ordered a 20-page amended complaint. (R. 32.) Defendants moved to dismiss. (R. 53–55, 74.) On December 10, 2025, Judge Dlott granted all motions. (R. 89.) On February 25, 2026 — after dismissal — Boydston filed a document using the word "fix" to describe the VL designation as engineered by HCLRC. (Ex. B.) Final judgment entered February 25, 2026. (R. 117.) Claims against TSO, Leutine, and Strunk were dismissed without prejudice under Rule 4(m) — not on the merits. (R. 116.) This appeal timely followed.**

## SUMMARY OF ARGUMENT

First, the dismissal must be reversed because a defendant cannot obtain dismissal of a complaint he has admitted under oath. At a January 2025 bench trial, Boydston testified that the sale price was calculated from expenses — not property value. Lentine testified the same sale was "an engineered sale." Boydston's own motion papers established that excess proceeds would flow back to the buyer, not the owner. Dismissing as implausible under *Iqbal/Twombly* a complaint that two defendants admitted under oath is paradigmatic reversible error.

Second, Rooker-Feldman does not bar claims alleging federal crimes committed during state proceedings where the federal injury is independent of the state court judgment. Under *McCormick v. Braverman*, 451 F.3d 382 (6th Cir. 2006), Appellant's RICO and constitutional claims allege independent federal injury and are not barred.

Third, Barton is a procedural requirement — not substantive immunity. Courts have recognized exceptions for ultra vires acts and wrongful seizure of property. *In re McKenzie*, 716 F.3d 404, 415 (6th Cir. 2013). A receiver cannot bootstrap immunity by drafting his own appointment order with self-enrichment provisions, and is not protected where he retained a known federal felon with billing-record documentation of that felon's criminal background.

Fourth, the complaint adequately pleads a RICO pattern. This was not a single-scheme, single-victim case. The enterprise targeted 1,500+ victims, operated for six years, generated seven categories of federal predicate acts, and continues to operate through an active foreclosure on Appellant's personal residence. Five federal convictions confirm the pattern.

Fifth, claims are timely. Civil RICO carries a four-year limitations period. Boydston's bench trial admission was January 2025 and his "fix" statement was February 2026 — both within the limitations period measured from the May 2025 complaint. Active concealment through information-control directives and bank record obstruction independently tolls any shorter period.

Sixth, leave to amend should be granted. The district court's own page-limit order made adequate pleading structurally impossible; a futility finding premised on deficiencies compelled by that order cannot stand.

Seventh through ninth, the record independently establishes wire fraud and obstruction predicate acts for Amy L. Higgins and Kara A. Czanik — including Czanik's post-dismissal candor violation — and for Cynthia Fisher and Dinsmore & Shohl LLP; the BOR attorney committed independent predicate acts by corrupting two official proceedings; and Lentine and Strunk should be reinstated with Susan Zurface added as a defendant.

A companion Emergency Motion for Stay Pending Appeal, filed simultaneously herewith, addresses four irreparable harms that cannot await resolution on the merits: disbursement of the $84,278.+ Provident Title escrow, destruction of bank records through an unsupervised receivership closure, insider sale of remaining portfolio properties, and foreclosure of Appellant's personal residence through a VL order the issuing judge has found defective. That motion is incorporated herein by reference, and the legal and factual bases for it are set forth in Argument Section X.

## ARGUMENT

### I. Standard of Review

This Court reviews de novo a district court's dismissal under Rule 12(b)(1) for lack of subject-matter jurisdiction and under Rule 12(b)(6) for failure to state a claim. Under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" The plausibility standard "is not akin to a probability requirement." *Id.*

### II. The District Court Erred in Dismissing a Complaint Two Defendants Admitted Under Oath

This is the dispositive issue of this appeal, and it requires reversal.

At the January 2025 bench trial, Boydston testified the sale price was calculated from expenses, not property value, and that the negotiation "was in anticipation of a haircut for Konza, and a haircut for TSO." (Ex. A, Tr. 156:8-15.) Joseph Lentine testified at the same proceeding that the transfer was "an engineered sale" and that HCLRC received preferential access to occupied buildings unavailable to competing bidders. Two enterprise defendants admitted the core allegation at trial.

The admission is further corroborated by Boydston's own motion papers, which stated explicitly that any residual sale proceeds — after payment of receivership fees — would be returned to the buyer, HCLRC, not to Appellant. In a legitimate receivership sale, surplus flows to the owner. Boydston's contractual routing of surplus back to the buyer is a self-drafted paper trail of the fraud.

**Twombly requires dismissal only when a complaint fails to state a claim plausible on its face. A defendant's sworn admission is more than plausibility — it is proof. Dismissal of allegations the defendant confirmed are true is paradigmatic reversible error. Moreover, on February 25, 2026 — after Judge Dlott's dismissal — Boydston filed a document using the word "fix" to describe the VL designation as engineered by HCLRC. (Ex. B.) This post-dismissal admission is properly before this Court. The dismissal must be reversed.**

## III. The District Court Misapplied Rooker-Feldman

***Rooker-Feldman* "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Appellant does not seek to overturn the foreclosure judgment. He seeks damages and injunctive relief for federal crimes — mail fraud, wire fraud, extortion, bank fraud, money laundering — committed in furtherance of the enterprise during state proceedings. The federal injury is independent of the state court judgment itself.**

**Under *McCormick v. Braverman*, 451 F.3d 382, 393–94 (6th Cir. 2006), Rooker-Feldman does not bar claims alleging attorneys committed fraud during state court proceedings. After *Exxon Mobil*, Rooker-Feldman is a "narrow" doctrine. *Lance v. Dennis*, 546 U.S. 459, 464 (2006). The district court's footnote 7 conflated claim preclusion with jurisdictional bar — distinct doctrines requiring distinct analysis. *RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 386 (6th Cir. 2021). Reversal is required.**

## IV. The District Court Misapplied the Barton Doctrine

*Barton v. Barbour*, 104 U.S. 126 (1881), is a procedural requirement — not substantive immunity. Courts have recognized exceptions for ultra vires acts and wrongful seizure of property. *In re McKenzie*, 716 F.3d 404, 415 (6th Cir. 2013). Every claim against Boydston is a fraud and ultra vires claim: drafting a self-enriching appointment order; double-billing through an unlicensed entity for the same hours and items; retaining a known federal felon with billing-record documentation of his criminal history; concealing the FBI investigation; continuing to employ Lentine after learning of federal fraud charges; calculating a sale price to guarantee his own recovery; engineering the Knoppe bid elimination; and routing surplus proceeds back to the buyer.

A receiver cannot bootstrap Barton immunity by drafting his own immunity provisions. The February 14, 2020 Order was Boydston's document (Dentons doc. no. 19709639.1). That document is evidence of the fraud, not a shield against it.

## V. The Complaint Adequately Pleads a RICO Pattern

### Multiple Victims

The district court's "single victim" finding misapprehends the record. The enterprise targeted five separate legal persons: (1) Emily Vets, LLC; (2) Virginia Williamsburg, LLC; (3) Boldface Properties, LLC; (4) Sedamsville Heritage Properties, LLC; and (5) John Jennagans, LLC — each a separately incorporated Ohio limited liability company, each holding a distinct portfolio of Sedamsville properties, each separately subjected to the VBML mechanism, and each separately stripped of its assets through the receivership. Five separate legal persons whose property rights were extinguished is not a single-victim pattern. Beyond the LLCs: (6) tenants of 23 properties were displaced during the receivership; (7) Knoppe's

competing $1 million bid was eliminated on a manufactured technicality, making him a direct victim of the obstruction; (8) the receivership estate itself was looted of $423,000+ by Lentine and Strunk; and (9) over 1,500 other Hamilton County property owners have been subjected to the identical VBML extortion mechanism. The district court counted one landlord. The record contains nine categories of victims.

Seven Predicate Act Categories

Mail Fraud (18 U.S.C. § 1341) — False monthly reports mailed to the court; false billing statements; BOR filings containing false property value assertions.

Wire Fraud (18 U.S.C. § 1343) — 49 electronic communications between Boydston and HCLRC's attorney Allesee coordinating the pre-arranged sale; electronic filing of the VL petition. *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006).

Bank Fraud (18 U.S.C. § 1344) — Approximately $1.2 million in fraudulent PPP loans — the primary basis for Lentine's 63-month federal sentence and Strunk's guilty plea. Lentine used TSO receivership operations to substantiate payroll figures underlying fraudulent PPP applications while simultaneously stealing receivership rents. This predicate act has been proven beyond a reasonable doubt in federal court.

Money Laundering (18 U.S.C. § 1956) — $437,799 in diverted rental income concealed through false monthly reports; double-billing between Konza LLC and Dentons invoices. Proceeds of the bank fraud were commingled with receivership funds and disbursed as purported management fees, constituting laundering of specified unlawful activity proceeds.

Extortion / Hobbs Act (18 U.S.C. § 1951) — $3,000 annual VBML fees under a commercially impossible insurance requirement, doubled through administrative penalties; $15,015

**retaliatory invoice issued months after Appellant filed his federal RICO complaint; fabricated fines and fees now threatening Appellant's personal residence.**

**Obstruction (18 U.S.C. § 1512(c)(2)) — *Fischer v. United States*, 603 U.S. 480 (2024), requires that the defendant impaired the availability or integrity of records, documents, or objects used in an official proceeding. That standard is met in two independent ways. First, Higgins's drafting of the VL order was designed to impair the availability of Appellant's filings — documents and objects used in pending state court proceedings. Second, Boydston's May 2020 directive channeling all Appellant'scommunications exclusively through himself impaired the availability of financial records that O.R.C. § 2735.04 required him to produce to the court. The VL "fix" silenced Appellant at the precise moment of the sale; Boydston's obstruction of bank record production continued for six years.**

**Witness Tampering (18 U.S.C. § 1512(b)(3)) — The fabricated stalking charge by convicted enterprise co-conspirator Strunk, filed seventeen days after Lentine's federal arrest and coordinated to silence Appellant during the property transfer.**

**Conversion of Personal Property — Additional Predicate Act (18 U.S.C. §§ 1341, 1343, 1951). The ¶15 owner lockout provision — self-drafted by Boydston — was deployed as an instrument of conversion extending beyond real property. Prior to the transfer deadline, Appellant transmitted two written email requests to Boydston seeking authorization to retrieve personal property stored at 701 Delhi Avenue: thirty-five years of irreplaceable historical records and preservation documentation, a 1987 BMW motorcycle of collector value, patent prototypes, and commercial restaurant equipment. Both requests went unanswered. Boydston's deliberate non-response — exploiting the ¶15 lockout he had self-drafted — effected conversion of over $60,000 in personal property. Each unanswered**

wire communication constitutes a use of wire facilities in furtherance of a scheme to deprive Appellant of property; the lockout itself constitutes extortion under color of the self-drafted court order. (Ex. Y.)

Open-Ended Continuity

The enterprise continues to operate: foreclosure is currently pending on Appellant's personal residence using fines never lawfully assessed against that property; $84,278 in escrow funds remains in active dispute between enterprise participants. Each new act in furtherance of the scheme — including the pending home foreclosure — demonstrates open-ended continuity. *H.J. Inc. v. Northwestern Bell*, 492 U.S. 229, 241 (1989). *Moon v. Harrison Piping Supply*, 465 F.3d 719 (6th Cir. 2006) (single victim, 30 months) is inappropriate. *Vemco, Inc. v. Camardella*, 23 F.3d 129 (6th Cir. 1994) (single victim, 17 months) is inappropriate. Five federal convictions confirm the pattern. The dismissal should be reversed.

VI. The Claims Are Timely Under the Discovery Rule

Civil RICO has a four-year limitations period. *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 156 (1987). The district court's application of a two-year period to RICO claims was legal error. Even under a two-year standard, Boydston's bench trial admission was January 2025 — within two years of the May 2025 complaint — and his "fix" statement was February 2026, after the complaint was filed. Fraudulent concealment independently tolls the period: Boydston's May 2020 directive channeling all TSO concerns through himself was active concealment; his repeated oppositions to bank record production blocked discovery of fraud he had a statutory duty under O.R.C. § 2735.04 to disclose. The

**continuing violation doctrine additionally applies: the current home foreclosure is the enterprise's most recent predicate act.**

## **VII. Leave to Amend Should Have Been Granted**

**Fed. R. Civ. P. 15(a)(2) requires that leave be freely given when justice requires. *Foman v. Davis*, 371 U.S. 178, 182 (1962). The district court's own order compressing a six-year, 664-docket-entry fraud into 20 pages made adequate pleading structurally impossible. A futility finding premised on deficiencies directly caused by a court-ordered page limit is an abuse of discretion. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The futility determination rested entirely on the erroneous Rooker-Feldman, Barton, and pattern holdings addressed in Arguments III through V. Reversal of those holdings eliminates any basis for a futility finding.**

**On remand, Appellant should be permitted to add as defendants: HCLRC, Hamilton County, Dinsmore & Shohl LLP, Amy L. Higgins, Kara A. Czanik, Brian E. Schultz, Cynthia Fisher, James L. Nieberding (counsel of record for Tri-State Organization and Joseph Lentine in A1905588, whose April 2025 and December 2025 filings on behalf of a federally convicted bank fraud defendant sought to extract proceeds of the underlying fraud from Appellant's receivership estate), Susan Zurface, Jacki Martin, and the Community Action Agency.**

## **VIII. The Record Establishes RICO Liability for Dinsmore & Shohl LLP, Amy L. Higgins, Kara A. Czanik, Cynthia Fisher, the Community Action Agency, Boydston as Associate-in-Fact, and the BOR Attorney**

### **A. Amy L. Higgins and Kara A. Czanik: Two Independent Predicate Acts**

**Amy L. Higgins drafted the VL Judgment Entry — the order bears her signature as its author: "Prepared by: /s/ Amy L. Higgins, Trial Attorney for Plaintiff." (Ex. F.) Kara A.**

**Czanik, also of Dinsmore & Shohl, filed the VL petition and served as HCLRC's litigation counsel throughout. Both executed the enterprise's core obstruction function.**

**Predicate Act One — Wire Fraud (18 U.S.C. § 1343). The VL petition was electronically filed through interstate wire facilities in furtherance of a scheme — confirmed by Boydston's own "fix" admission — to strip Appellant of court access at the moment of a $3.5 million property transfer. Electronic court filings satisfy the wire element. *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006). The fraudulent character of the instrument has been judicially recognized: the judge who entered the VL Order recused for "appearance of impropriety" and found the procedure "procedurally unworkable."**

**Predicate Act Two — Obstruction (18 U.S.C. § 1512(c)(2)). Higgins drafting a judicial order to silence the enterprise's primary opposing witness at the moment of a $3.5 million property sale is the corrupt operation of a judicial instrument. *Fischer v. United States*, 603 U.S. 480 (2024). The instrument was not zealous advocacy — it was a coordinated suppression mechanism, as Boydston's own "fix" admission confirms.**

**Czanik's Post-Dismissal Candor Violation. On March 20, 2026, Czanik filed a Notice of Supplemental Authority citing the Luebbers strike order while omitting the recusal entered the same day. (Ex. I.) Ohio RPC 3.3(a)(2) prohibits a lawyer from failing to disclose directly adverse legal authority to a tribunal. A judge's same-day recusal for "appearance of impropriety" in the proceeding being cited as authority is directly adverse to any argument that the proceeding was legitimate. Czanik's selective presentation is an independent act of obstruction of an official proceeding occurring after the district court dismissal and squarely before this Court.**

**Mandatory Disqualification of Dinsmore & Shohl Counsel. Because Higgins, Czanik, Schultz, and Fisher are named as proposed defendants, their continued representation of HCLRC creates a non-waivable conflict under Ohio Rule of Professional Conduct 1.7. Each is a necessary witness under Ohio RPC 3.7 — Higgins as drafter of the VL order, Czanik as filer of the March 20, 2026 Notice of Supplemental Authority, Schultz as siguatory to the HCLRC distribution opposition, and Fisher as participant in the post-closing coordination documented by Boydston's billing records. The conflict is imputed to Dinsmore & Shohl LLP under Rule 1.10. Disqualification of these attorneys and their firm is not discretionary — it is mandatory — and should be ordered before Dinsmore appears further on behalf of any defendant in this case.**

**Dentons' Independent *RevoLaze* Exposure. Dentons Bingham Greenebaum — the law firm employing receiver Richard Boydston — has an independent and separate conflict-of-interest exposure that is a matter of adjudicated Ohio record. In *RevoLaze LLC v. Dentons US LLP*, 8th Dist. Cuyahoga No. 109742, 2022-Ohio-1392, a Cuyahoga County jury awarded $32,262,488.50 against Dentons — the largest legal malpractice verdict in Ohio history — for violation of Ohio RPC 1.7. The Ohio Court of Appeals unanimously affirmed; the Ohio Supreme Court denied review. The malpractice arose because Dentons US represented a client while Dentons Canada (operating through the same verein structure) simultaneously represented an adverse party — the identical structural conflict implicated here, where Boydston's billing records, ghostwritten HCLRC memoranda, and bench trial testimony demonstrate that Dentons served as Boydston's personal litigation shield while simultaneously charging the receivership estate Appellant was owed. That Dentons has been adjudicated for this identical failure in Ohio's courts and found liable for the largest**

malpractice verdict in state history is material context for this Court's evaluation of the Rule 1.7 claims against Dentons and Boydston individually — claims that are wholly independent of the Dinsmore disqualification issue and involve a different law firm, different clients, and a different conflict structure.

B. Cynthia Fisher (Dinsmore & Shohl): Billing Records Prove Post-Closing Cover-Up

Fisher represented HCLRC — the buyer. Konza LLC / Boydston was the court-appointed Receiver — the nominal adverse party. Ohio RPC 4.2 prohibits opposing counsel from communicating about the subject of the representation without consent. Boydston's billing records (Ex. R) show zero Fisher entries for three-plus years of the receivership, followed by sixteen entries beginning seventeen days after the sale closed — all coordinated to reposition Boydston from co-conspirator to victim in the June 5, 2023 memorandum. That memorandum omitted his 200-plus post-arrest communications with Lentine, his 30-month failure to terminate, and his ex parte violations. Appellant paid, through the estate, for the cover-up of his own losses.

C. Community Action Agency: § 666 Federal Program Theft

A tenant affidavit establishes that Lentine collected four to five months of CAA federal rental assistance per tenant without applying those funds to tenant accounts. When CAA official Matt Straus was informed, his response was: "sounds like fraud to me." If CAA continued disbursements to Lentine after receiving that notice, those continued disbursements constitute knowing participation in the scheme. 18 U.S.C. § 666 prohibits misapplication of funds from programs receiving federal assistance exceeding $10,000. The record cannot be assessed

without discovery into CAA's post-notice disbursement records, and this Court should direct that discovery before entertaining any renewed motion to dismiss CAA.

D. Boydston Became an Associate-in-Fact Through Post-Notification Billing

After Appellant filed formal court notice documenting Lentine's theft of receivership rents and deposits, O.R.C. § 2735.04 imposed mandatory duties: disclose the theft to the court, take steps to remedy it, and account for the missing funds. Boydston's billing entries following that notice do not reflect disclosure, remediation, or accounting. They reflect billable time charged to the receivership estate to manage the court's perception of the theft — time billed to protect the thief rather than to report the crime. Those entries are simultaneously: (1) proof of actual notice; (2) a documented choice to conceal over a statutory duty to report; and (3) charges to the estate for the concealment — meaning Appellant paid, through the estate, for the cover-up of his own losses. *Boyle v. United States*, 556 U.S. 938 (2009).

E. The BOR Fraud: Two Independent Predicate Acts

Boydston filed BOR forms representing he would use a "professional appraiser." (Ex. P.) He retained Jennifer Donathan of Keller Williams — a licensed real estate agent, not a certified appraiser — to submit the valuation. Donathan's submissions were so extreme that they were irreconcilable with the BOR's own appraiser's findings: 685 Halsey valued at $1,000 total when land alone was appraised at $17,000–$19,000 minimum; 636 Delhi reduced from $137,000 to $50,000 after improvements were made to the property. The BOR attorney — whose obligation runs to the integrity of the valuation proceeding — influenced the Board to approve both fraudulent valuations over the objection of the Board's own appraiser, Mr. Cain.

**Predicate Act One — Mail/Wire Fraud (18 U.S.C. §§ 1341, 1343). The BOR process necessarily involves mailing or electronic transmission of official documents: hearing notices, valuation determinations, and certified orders. Each such communication transmitting the fraudulent $1,000 valuation for 685 Halsey or the fraudulent $50,000 valuation for 636 Delhi constitutes a separate predicate act. A $1,000 valuation for a property whose land alone is worth $17,000–$19,000 minimum cannot be explained by legitimate professional judgment.**

**Predicate Act Two — Obstruction (18 U.S.C. § 1512(c)(2)). The BOR is an official proceeding. The BOR attorney's conduct — overruling his own agency's appraiser to manufacture valuations that served the enterprise rather than the County's legitimate interest — falls squarely within § 1512(c)(2). The structural parallel to Higgins's conduct in the VL proceeding is exact: both officials corrupted the instrument of an official proceeding rather than serving its legitimate purpose. The BOR attorney's identity, deliberately omitted from Boydston's otherwise meticulous billing records, will be established through BOR email discovery on remand.**

## IX. Lentine and Strunk Should Be Reinstated and Susan Zurface Added

**Lentine and Strunk were dismissed without prejudice under Rule 4(m) — not on the merits. That dismissal does not preclude reinstatement on remand. The documentary record forecloses any innocent explanation for Strunk's stalking allegations: a U-Haul receipt places Appellant in Cincinnati at 8:00 a.m. on September 17, 2021; a fuel receipt places him in Delhi, Ohio at 8:28 a.m. — thirteen minutes after the alleged stalking — and a second fuel receipt places him in Hebron, Ohio at 10:46 a.m. en route to Pittsburgh. (Ex. S.) Strunk filed these**

four false police reports seventeen days after Lentine's federal arrest — timed to neutralize Appellant's ability to challenge the receivership transfer during its final phase.

Appellant was wrongfully imprisoned for approximately one year as a result. That imprisonment corresponded precisely to the period in which the enterprise completed its pre-negotiated property transfer. He could not appear in court to challenge the auction, could not move to enjoin the sale, and could not respond to the manufactured technicality that eliminated Knoppe's competing $1 million bid. While imprisoned on the fabricated charges, Appellant suffered a severe physical assault by another inmate requiring emergency transport to University of Cincinnati Medical Center for evaluation of internal injuries and MRI examination for head trauma, followed by over two months in the jail medical ward. His wife of 40 years died while he was imprisoned. The false arrest was not incidental to the enterprise. It was its most effective operational tool, and the physical injuries it produced are its most concrete documented consequence.

Prosecutor Zurface coached Strunk to provide specific times for the alleged stalking incidents without factual foundation — times the documentary record proves physically impossible. A prosecutor who coaches a witness to provide time-specific testimony that receipts disprove has not made a good-faith error. She has manufactured false testimony. Zurface's conduct states a claim under 42 U.S.C. § 1983 for violation of Appellant's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). Damages attributable to the physical assault and resulting hospitalization constitute physical injury damages recoverable against Zurface, Strunk, and Lentine jointly and severally, and are excluded from gross income under 26 U.S.C. § 104(a)(2) as damages for physical injuries.

## X. Emergency Relief Pending Appeal: Stay of Escrow Distribution, Bank Records Production, Prohibition on Property Sales, and Stay of Personal Residence Foreclosure

Appellant respectfully requests that this Court, pursuant to Fed. R. App. P. 8, Fed. R. Civ. P. 65, and 28 U.S.C. § 1651 (All Writs Act), issue emergency relief in the four respects set forth below. A companion Emergency Motion for Stay Pending Appeal has been filed simultaneously pursuant to Fed. R. App. P. 27. The four-factor framework governing stays applies: (1) likelihood of success on the merits; (2) irreparable harm absent a stay; (3) harm to other parties; and (4) public interest. *Mich. Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991); *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

Likelihood of Success on the Merits. The merits standard is satisfied by the record set forth in Arguments I through IX. Two defendants admitted the core RICO allegation under oath. The receiver's own motion papers established that proceeds flow to the buyer rather than the owner. The judge who entered the VL order has recused for appearance of impropriety and found the procedure unworkable. Five federal convictions validate the underlying conduct. The likelihood of success on the merits is clearly established.

A. Stay of Provident Title Escrow ($84,278+) Pending Reconciliation

Approximately $84,278 in escrow funds is presently held by Provident Title as escrow agent in Case No. A1905588. Boydston seeks to retain the receivership open to draw further fees. HCLRC seeks closure and distribution. Neither party is entitled to these funds: they are the proceeds of a sale the receiver admitted under oath was priced from expenses rather than property value; they represent tbe last tangible assets of the receivership estate; and they must be applied to Appellant's damages upon remand.

**Irreparable Harm: Distribution of the escrow funds before this appeal is resolved will permanently eliminate the last identifiable pool of receivership assets. Money is fungible; once distributed to a governmental land bank with arguable immunity defenses and a professional receiver of unknown means, clawback is practically foreclosed. This Court has authority under 28 U.S.C. § 1651 and Fed. R. App. P. 8 to issue an injunction preserving the subject matter of the appeal pending decision. *Ne. Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999 (6th Cir. 2006). Appellant requests this Court stay any disbursement of the Provident Title escrow funds pending: (1) resolution of this appeal; or (2) a complete, court-supervised reconciliation of all receivership income and expenses, with mandatory bank record production and notice to Appellant.**

**B. Immediate Production of All Receivership Bank Records Within Fourteen Days**

**Boydston opposed bank record production on twelve or more occasions throughout the receivership. Those same records — now that Lentine has been federally convicted and Strunk has entered a guilty plea — are no longer shielded by any legitimate interest. No reconciliation of the $84,278 escrow can occur without them. No accounting can be performed without them.**

**Appellant requests this Court order, as a condition of any escrow distribution, production to Appellant within fourteen (14) days of all bank records for all receivership accounts, including all accounts in the names of Konza LLC, Tri-State Organization Inc., Joseph Lentine, or Angel Strunk that received or disbursed receivership funds from February 2020 through the present. This is not a discovery request. This is accounting — which Boydston was required to provide under O.R.C. § 2735.04 and failed to provide for six years.**

**C. Prohibition on Sale or Transfer of Any Remaining Properties Absent Independent Broker and Open-Market Conditions**

Properties from the original 59-property receivership portfolio remain in HCLRC's possession and available for sale or transfer. This Court has authority under 28 U.S.C. § 1651 and Fed. R. Civ. P. 65 to issue an injunction prohibiting the sale or transfer of any property that (1) was part of the original 59-property receivership portfolio or (2) is subject to VBML-mechanism liens assessed by the City of Cincinnati, pending resolution of this appeal.

Irreparable Harm: Real property is unique. Once transferred, specific performance — including return of 685 Halsey Street for $1,000 and return of 679 Delhi Avenue — is rendered impossible. No damages remedy adequately compensates for the specific properties Appellant spent 35 years rehabilitating.

Insider Sale Risk. The original January 2023 "auction" was a pre-negotiated transfer: HCLRC's board authorized acquisition before the auction was held; the sole competing bid was eliminated on a manufactured technicality; and the pricing mechanism was designed to guarantee a specific outcome for a pre-selected buyer. The same enterprise participants remain in place. Absent court supervision, any future sale of the rehabilitated portfolio properties presents the identical risk: an insider — an employee, contractor, or associate of HCLRC, the City of Cincinnati, or the Port of Greater Cincinnati Development Authority — could acquire at below-market prices through a non-competitive process, cycling the enterprise's benefit from its own fraud into a new transaction.

Appellant requests this Court condition any permitted sale of portfolio properties during the pendency of this appeal on the following open-market requirements:

- All sales shall be conducted through an independent, licensed real estate broker — Coldwell Banker or a nationally recognized equivalent — with no employment, contractual, or ownership relationship with HCLRC, the City of Cincinnati, the Port of Greater Cincinnati Development Authority, or any affiliate.

- Each property shall be listed on the Multiple Listing Service (MLS) and held open for competitive bidding for a minimum of twenty (20) consecutive calendar days before any offer may be accepted.

- No offer may be accepted from any person, partnership, limited liability company, trust, or corporation in which any current or former employee, officer, board member, or contractor of HCLRC, the City of Cincinnati, or the Port of Greater Cincinnati Development Authority holds a direct or indirect ownership interest.

- No offer may be accepted from any purchaser who has held an ownership interest in residential or commercial real property within Hamilton County, Ohio within the preceding five (5) years, individually or through any entity — ensuring that rehabilitated properties are transferred to new ownership rather than cycled within the same institutional network.

- All bids received, the identity of all bidders, and the ultimate sale price and buyer identity shall be reported to this Court within seven (7) days of closing.

D. Stay of Foreclosure Proceedings Against Appellant's Personal Residence (5615 Sidney Road)

Appellant's personal residence at 5615 Sidney Road, Cincinnati, Ohio 45238, is presently subject to foreclosure proceedings based on over $60,000 in tax liens, fines, and fees. The majority of these liens arise from the same VBML extortion mechanism described in

**Argument V, now applied to Appellant's personal residence rather than his investment portfolio.**

**The foreclosure presents a unique constitutional dimension that has no parallel in ordinary stay litigation. The Vexatious Litigator order — admitted by its beneficiary to be a "fix," found "procedurally unworkable" by the judge who signed it, and prompting that judge's recusal for "appearance of impropriety" — remains on the books in Hamilton County state court. That order prohibits Appellant from filing any document in Hamilton County state court without leave of court. He cannot, therefore, file a motion to dismiss, an answer, a motion for stay, or any other defensive pleading in the foreclosure proceeding without first obtaining leave — leave that the procedure generating it has been declared unworkable to obtain.**

**This is the enterprise's closing maneuver: deploy the fraudulent VL order to strip Appellant of his ability to defend his home, then foreclose on that home using fabricated fines and fees while the federal appeal challenging the entire enterprise is pending. The harm is immediate. This Court has authority under 28 U.S.C. § 1651 and the All Writs Act to issue relief necessary to protect the integrity of this Court's appellate jurisdiction. The foreclosure, if completed, would eliminate Appellant's primary remaining asset and reward the enterprise's most egregious instrumentality with its intended consequence.**

**Appellant requests this Court issue a temporary stay of all foreclosure proceedings against 5615 Sidney Road, Cincinnati, Ohio 45238, pending resolution of this appeal, with a direction to the state court to acknowledge the VL order's defective status as adjudicated by Judge Luebbers.**

## CONCLUSION AND RELIEF REQUESTED

**For the foregoing reasons, this Court should:**

**1. Reverse the district court's December 10, 2025 Order (R. 89) granting Defendants' Motions to Dismiss;**

**2. Reverse the January 13, 2026 Order (R. 103) denying extension of time to serve;**

**3. Remand with instructions to permit Appellant to file an amended complaint of appropriate length;**

**4. Remand with instructions to permit addition of HCLRC, Hamilton County, Dinsmore & Shohl LLP, Amy L. Higgins, Kara A. Czanik, Brian E. Schultz, Cynthia Fisher, James L. Nieberding, Susan Zurface, Jacki Martin, and the Community Action Agency as defendants;**

**5. Direct the District Court to require disqualification briefing before Dinsmore & Shohl LLP appears further on behalf of any defendant;**

**6. Appoint a Special Master under Fed. R. Civ. P. 53 to manage discovery and complex accounting spanning six years, 664 docket entries, 5,451 pages, and $423,169 in unaccounted receivership funds;**

**7. Reassign to a different district judge under 28 U.S.C. § 2106 and *U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518 (6th Cir. 2012);**

**8. Direct re-service and reinstatement of Defendants Lentine and Strunk, dismissed without prejudice under Rule 4(m) and not on the merits;**

**9. Issue emergency relief staying disbursement of the Provident Title escrow ($84,278+) pending reconciliation with mandatory bank records production within fourteen days;**

**10. Issue an order conditioning any sale of portfolio properties on compliance with the independent broker, 20-day open-market listing, and insider-purchase prohibition requirements set forth in Argument X.C; and**

**11. Issue an emergency stay of all foreclosure proceedings against Appellant's personal residence at 5615 Sidney Road, Cincinnati, Ohio 45238, pending resolution of this appeal, and noting the defective status of the Vexatious Litigator order as adjudicated by Judge Luebbers.**

**Damages**

| Damage Component | Amount |
| --- | --- |
| **Property value loss (59 properties): FMV $3,500,000 minus $800,000 nominal cash price (actual HCLRC cost substantially lower after $400,000+ in R.C. 5709.12(F) tax exemptions and undisclosed federal, state, county, and City subsidy funding admitted by Boydston in the February 25, 2026 Memorandum at 10)** | **$1,760,000 minimum; adjustable upward on proof of actual HCLRC consideration** |
| **621 Delhi Avenue losses (forced vacancy, lost rents, vandalism)** | **$105,000 + $1,000/mo. continuing** |

| | |
|---|---|
| **Fabricated City fines and fees (extortion — VBML mechanism)** | **$412,500** |
| **Fabricated fines/fees on personal residence (5615 Sidney) — ongoing** | **$60,000+** |
| **Konza LLC/Dentons extraction (double-billing — same hours billed twice)** | **$343,301** |
| **TSO theft (Boydston/Dentons jointly and severally liable)** | **$423,169** |
| **Real estate commission overpayment** | **$56,000** |
| **Conversion of personal property at 701 Delhi (historical records, 1987 BMW, patent prototypes, restaurant equipment)** | **$60,000** |
| **Wrongful imprisonment (~1 year) including: severe physical assault requiring UC Medical Center hospitalization, internal injury evaluation, head trauma MRI, 2+ months in jail medical ward; lost property-protection opportunity during property transfer; lost income; potential permanent injury; emotional distress; loss of spouse of 40 years** | **$1,500,000+** |
| **TOTAL ACTUAL DAMAGES** | **$4,719,970+** |

**Under 18 U.S.C. § 1964(c), Appellant is entitled to treble damages ($14,159,910+), plus attorney fees under O.R.C. § 2323.51 and *Nakoff v. Fairview General Hospital*, 75 Ohio St.3d 254 (1996) ($135,000+ for 900+ documented hours), plus costs.**

**Tax Gross-Up. Defendants are jointly and severally liable for an additional amount sufficient to offset the federal and Ohio state income tax liability on all taxable components of the judgment, calculated at Appellant's applicable marginal rates in the year of receipt, such that Appellant receives the full economic equivalent of each compensatory and statutory damages component net of taxes. The physical injury components of the wrongful imprisonment damages — including the severe assault requiring UC Medical Center hospitalization, internal injury evaluation, head trauma MRI, and two-month jail medical ward stay — are excluded from gross income under 26 U.S.C. § 104(a)(2) as damages attributable to documented physical injuries and physical sickness; those components require no gross-up. The treble damages component under 18 U.S.C. § 1964(c) and punitive damages under 42 U.S.C. § 1983 are fully taxable at ordinary income rates per *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955); defendants shall pay the gross-up required to make those awards whole after federal and Ohio income tax. Defendants whose wrongful conduct generated the taxable event cannot benefit from the tax cost that event imposes on the victim.**

**Specific Performance / Constructive Trust**

- **Return of 685 Halsey Street for $1,000 (holding HCLRC to the fraudulent BOR valuation it manufactured)**

- **Return of 679 Delhi Avenue**
- **Current FMV of remaining 57 properties (estimated $4,000,000+, including all HCLRC improvements)**
- **Disgorgement of all rents collected by HCLRC since January 2023**
- **Release of all liens on 5615 Sidney Road arising from fabricated VBML fines and fees**
- **Continuing damages: $1,000/month for 621 Delhi Avenue until possession restored**
- **Wrongful imprisonment and physical injury damages (Lentine/Strunk/Zurface, joint and several): $1,500,000+**
- **Attorney fees under O.R.C. § 2323.51 and Nakoff v. Fairview General Hospital: $135,000+**
- **Tax gross-up: amount sufficient to offset federal and Ohio income tax on all taxable judgment components at Appellant's applicable marginal rates**
- **Costs of this action**
- **Punitive damages under 42 U.S.C. § 1983 against individual defendants, in accordance with Smith v. Wade, 461 U.S. 30 (1983); municipal defendants are immune from punitive damages under Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981)**
- **Declaratory judgment that VL designation is void ab initio**
- **Such other relief as the Court deems just**

**Reassignment Under United States v. Robin, 553 F.2d 8 (2d Cir. 1977)**

**All three *Robin* factors favor reassignment under 28 U.S.C. § 2106, as confirmed by *U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518 (6th Cir. 2012): (1) The district court**

dismissed as implausible a complaint that two defendants admitted under oath — a judge who made that determination would reasonably have difficulty approaching the same record with the neutrality remand requires. (2) The appearance of justice is not served by returning this case to the judge whose dismissal order is being reversed for paradigmatic reversible error on the merits. (3) This case is at the pleading stage; no discovery has occurred; reassignment involves minimal waste and will fully preserve judicial economy.

Request for Oral Argument and Reservation of Reply

Appellant respectfully requests oral argument pursuant to Fed. R. App. P. 34 and reserves his right to file a reply brief addressing the arguments raised in Appellees' response briefs pursuant to Fed. R. App. P. 31(a)(1). Should the Court determine oral argument is not required, Appellant submits this appeal on the briefs, the record, and the exhibits designated herein.

Respectfully submitted,

John Klosterman

Pro Se Appellant
5615 Sidney Road
Cincinnati, Ohio 45238
Telephone: (513) 250-2610
Email: johncklosterman@gmail.com
Dated: April 23, 2026

**CERTIFICATE OF COMPLIANCE**

**This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,442 words, excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman 12-point font.**

______________________________

**John Klosterman**

**CERTIFICATE OF SERVICE**

**I hereby certify that on April 23, 2026, I electronically filed the foregoing Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.**

**John Klosterman**

## ADDENDUM: RELEVANT DISTRICT COURT ORDERS

**A-1: Judgment (R. 117, filed 02/25/26) and Appeal feb 26 R118 2/26/26**

**A-2: Order Granting Defendants' Motions to Dismiss (R. 89, filed 12/10/25)**

**A-3: Order Adopting Report and Recommendation (R. 103, filed 01/13/26)**

**A-4: Order Dismissing Without Prejudice Under Rule 4(m) (R. 116, filed 02/25/26)**

**A-5: Order Dismissed without prejudice Lentine and Strunk and other orders (R. 117, filled 2/25/26)**

## DESIGNATION OF RELEVANT EXHIBITS

### DEFENDANT ADMISSIONS

**Ex. A — Bench Trial Transcript Excerpt (January 2025, A1905588) — Boydston sworn admission that sale price was calculated from expenses, not value (Tr. 156:8-15); Lentine testimony that transfer was "an engineered sale" with preferential HCLRC access;**

**Ex. B — Boydston Filing (February 25, 2026, A1905588) — "Fix" statement admitting VL designation was engineered by HCLRC [POST-DISMISSAL]**

**Ex. AA — Receiver's Reply to HCLRC Opposition to Second Fee Application (January 12, 2026, A1905588) — Boydston's written admission that he personally "obtained the order approving the sale" and "saw to the closing on the HCLRC Sale," and that his work was "of direct benefit to HCLRC" — a court-appointed receiver's admission of fiduciary inversion in writing; also documents 27-month HCLRC silence followed by fee objection, evidencing enterprise cohesion until payment dispute.**

**Ex. BB — TSO/Lentine-Boydston-HCLRC Enterprise Documentation (Case No. A1905588) — Three coordinated filings establishing enterprise payment structure and ongoing distribution scheme: (1) TSO/Lentine Objections to Magistrate's Decision (April 24, 2025), filed by James L. Nieberding, establishing that "Konza repeatedly promised to pay TSO from the proceeds of the final sale as a form of consideration" and attaching Magistrate Liu's decision finding that "it was not possible for Konza to manage these properties without TSO"; (2) HCLRC Memorandum in Opposition to TSO Motion for Distribution (September 26, 2025), filed by Kara A. Czanik and Brian E. Schultz of Dinsmore & Shohl LLP, conceding $85,950.62 escrow balance and negotiating distribution schedule; (3) TSO Response to**

Motion to Terminate Receivership (December 19, 2025), filed by Nieberding, seeking court-ordered distribution of $57,271.18 from Appellant's receivership estate to a company owned by a federally convicted bank fraud defendant.

Ex. CC — Receiver's Corrected Memorandum in Opposition to HCLRC Motion to Terminate Receivership (February 25, 2026, A1905588) — Filed by Boydston on the same day as the federal district court's final judgment (R. 117). Contains Boydston's written admissions that (a) "the Receiver was a necessary agent for delivery of the properties to HCLRC" (at 10); (b) the $800,000 cash component was funded through undisclosed combinations of federal COVID-era funding, State of Ohio funding, Hamilton County funding, and City of Cincinnati funding (at 10); (c) HCLRC received over $400,000 in real estate tax exemptions under R.C. 5709.12(F) (at 3, 10); (d) HCLRC "negotiated the assignment from the City of Cincinnati of the judgment lien" for undisclosed consideration while simultaneously negotiating City funding of the purchase price (at 4); (e) the "fix" statement regarding the VL designation obtained by HCLRC in A2300473 (at 13); (f) the Port of Greater Cincinnati Development Authority reported $16,330,694 in net income for 2024 (at 3); and (g) HCLRC's December 8, 2025 Sedamsville RFP confirming the institutional execution of Appellant's original development plan at Appellant's planned price point (at 2–3).

ENTERPRISE COORDINATION

Ex. C — Order Appointing Receiver (February 14, 2020, Dentons Doc. No. 19709639.1) — Self-drafted order with immunity provisions; $1,000 bond for $3.5M estate; excess proceeds contractually returned to buyer HCLRC

**Ex. D — HCLRC Board Minutes (July 25, 2023) — Denning reporting on "the City legal actions" re VL, proving City/HCLRC coordination**

**Ex. E — HCLRC memo by Cynthia Fisher (June 5, 2023) — $437,799.42 unaccounted; Ghost written by Boydston**

**VEXATIOUS LITIGATOR — VL ORDER AND JUDICIAL COLLAPSE**

**Ex. F — VL Judgment Entry (July 10, 2023) — "Prepared by: /s/ Amy L. Higgins, Trial Attorney for Plaintiff"**

**Ex. G1 — Judge Luebbers Recusal Entry (March 19, 2026) — "Appearance of Impropriety"**

**Ex. G2 — Judge Luebbers Strike Order (March 19, 2026) — VL procedure "Procedurally Unworkable"**

**Ex. H — First District Court of Appeals Judgment Entry (July 24, 2024) — VL affirmance**

**Ex. I — Czanik/HCLRC Notice of Supplemental Authority (March 20, 2026) — Cites Luebbers strike order; omits same-day recusal — RPC 3.3(a)(2) violation**

**FEDERAL CRIMINAL CONVICTIONS**

**Ex. J — Joseph Lentine Judgment of Conviction — 63 months federal imprisonment (bank fraud, PPP loans, receivership misappropriation)**

**Ex. K — Angel Strunk Guilty Plea / Judgment — 5 years' probation, $47,000 restitution**

**BILLING / FINANCIAL RECORDS**

**Ex. L — Boydston July 5, 2023 Affidavit — Admits "near-daily contact" with Lentine for 34 months (¶21)**

**Ex. M — Letter to Dentons re Billing Irregularities (April 28, 2023) — No response received**

**Ex. R — Dentons Second Billing Records — Zero Fisher contact pre-closing; 16 post-closing entries ; Double billing documented between Dentons and Konza,LLC**

**CITY SOLICITOR KNOWLEDGE / COVER-UP**

**City Solicitor Garth Filing (post-arrest 2021) — "Lentine had only been arrested"**

**HAMILTON COUNTY BOARD OF REVISION FRAUD**

**Ex. O — BOR Valuation Documents (685 Halsey) — BOR attorney influenced Board to overrule BOR's own appraiser; $1,000 total valuation for property with $17–$19K land value minimum**

**Ex. P — Boydston BOR Form — False representation that professional appraiser would be used; Jennifer Donathan (Keller Williams agent, not certified appraiser) submitted instead**

**Ex. Q — BOR Valuation Documents (636 Delhi) — BOR attorney approved fraudulent reduction from $137,000 to $50,000 after improvements**

**PERSONAL RESIDENCE / EMERGENCY RELIEF**

**— Current Lien Search on 5615 Sidney Road — Documenting $60,000+ in fabricated VBML fines and fees underlying pending foreclosure**

**FALSE ARREST / WRONGFUL IMPRISONMENT**

**Ex. S — U-Haul Rental Receipt (September 17, 2021, 8:00 a.m., Cincinnati) and Fuel Receipts (8:28 a.m. Delhi, Ohio; 10:46 a.m. Hebron, Ohio) — Physical impossibility of Strunk's stalking allegations**

**Ex. T — Strunk's ~~Four~~ False Police Reports (September 17, 2021) — Filed seventeen days after Lentine's federal arrest**

**Ex. Z — (Appellant will request via subpoena records from HC justice Center and University of Cincinnati Medical Center records and jail medical ward documentation) — Emergency transport for potential internal injuries and head trauma MRI following severe assault by inmate; 2+ months in jail medical ward; perpetrator received 6 additional months on sentence. Establishes physical injury component of wrongful imprisonment damages and 26 U.S.C. § 104(a)(2) exclusion basis.**

**APRIL 2023 RICO WARNING**

**Ex. U — Klosterman Letter to Judge Luebbers and Magistrate Berding (April 3, 2023) — Pre-closing warning letter predicting the full RICO scheme seven months before the VL Order and three weeks before closing; identifies wire fraud, collusion, obstruction of justice, money laundering, conspiracy, and racketeering as predicate acts; cross-references U.S. Government Case No. 1:21mj633 (the FBI investigation producing the Lentine and Strunk convictions); reports HCLRC General Counsel Kelly Allesee's on-the-record statement to Magistrate Berding that the receivership issues "are the tip of the iceberg" and that Lentine should have been fired 33 months earlier — HCLRC's own General Counsel acknowledging deeper wrongdoing before her client closed the acquisition.**

**Ex. V — Klosterman Affidavit (July 14, 2023, notarized before Austin T. Stephens) — Sworn statement: Boydston "was in on the fix" — ¶33**

**PERSONAL PROPERTY CONVERSION**

**Ex. Y — [Subject to production from Boydston email records in discovery.]**

**Email correspondence: two unanswered written requests to Boydston seeking authorization to retrieve personal property from 701 Delhi Avenue prior to transfer deadline — 1987 BMW (collector/historic value), patent prototypes, commercial restaurant equipment, 35 years of Sedamsville historical preservation records. Non-response under ¶15 lockout effected conversion of $60,000+ in personal property.**